IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

SHAWN LOUIS JACOBS,

        Plaintiff,

vs.                                    No. CIV 00-139 JP/LFG

SHANNON McREYNOLDS
Programs Director,

        Defendant.

## MAGISTRATE JUDGE'S ANALYSIS
## AND RECOMMENDED DISPOSITION[1]

      This is a *pro se, in forma pauperis* civil rights action pursuant to 42 U.S.C. § 1983.  Plaintiff Shawn Louis Jacobs ("Jacobs") filed this action against several corrections officials, as well as the New Mexico Corrections Department ("NMCD").  All defendants, with the exception of Shannon McReynolds, Programs Director for the NMCD,  have been dismissed from the case.

      Jacobs alleges that Defendant violated his First Amendment freedom of religion and the Eighth Amendment's proscription against cruel and unusual punishment by prohibiting him from ordering certain religious materials, including sage, sweetgrass, and cedar used in Native American ceremonies, and by threatening to force him to cut his hair.  He alleges also that Defendant  violated his right to equal protection, by prohibiting his religious practices on grounds he cannot prove that

---

[1] Within ten (10) days after a party is served with a copy of this legal analysis and recommendations, that party may, pursuant to 28 U.S.C. § 636(b)(1), file written objections to such analysis and recommendations. A party must file any objections with the Clerk of the U.S. District Court within the ten-day period allowed if that party wants to have appellate review of the analysis and recommendations.  If no objections are filed, no appellate review will be allowed.

he actually is Native American.  Jacobs claims Native American heritage and also claims to practice Animism religion, "Which is the same religion that is practiced by Native American Indians." (Complaint, at 2).

The Court ordered submission of a Martinez Report[2] [Doc. 19].  The parties were given notice that the Martinez Report could be used in deciding whether to grant summary judgment of Plaintiff's claims.  Defendant submitted the report [Doc. 26], and Plaintiff filed a response [Doc. 27]. Jacobs has also filed several requests for injunctive relief, alleging he is in imminent danger of having his hair forcibly cut.  In response to his latest request for an injunction, the Court directed Defendant to submit a supplementation to the Martinez Report, addressing this issue.  The Supplementation to Martinez Report was filed on January 19, 2001 [Doc. 37].  Jacobs filed a response [Doc. 38] on January 25, 2001.  This matter is now ripe for resolution on summary judgment.

Pursuant to Rule 56(c), F. R. Civ. P., the Court may grant summary judgment if the pleadings, depositions, answers to interrogatories and admissions or affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.  The opposing party must be given notice and an opportunity to respond, as provided in Rule 56.  Hall v. Bellmon, 935 F.2d 1106, 1111 (10th Cir. 1991).  Defendant, having filed a Martinez Report, is in the position of a movant for summary judgment.  As such, he carries the burden of establishing that there is no genuine issue of material fact, but he may discharge this burden by showing there is an absence of evidence to support the plaintiff's case.  Celotex Corp. v. Catrett, 477 U.S. 317, 325, 106 S. Ct.2548 (1986).  Once the movant meets its burden, the burden shifts to the plaintiff to demonstrate

---

[2]The Court may order defendant in a case brought by a prisoner proceeding *pro se* to submit a special report referred to as a Martinez report.  The report is an investigation of the incident which is the basis of the lawsuit.  *See*, Martinez v. Aaron, 570 F.2d 317 (10th Cir. 1978).

a genuine issue for trial on a material matter.  Bacchus Indus., Inc. v. Arvin Indus., Inc., 939 F.2d

887, 891 (10th Cir. 1991).  The party opposing the motion may not rest on his pleadings, mere

argument or contention, but must set forth specific facts showing there is a genuine issue for trial as

to those dispositive matters for which he carries the burden of proof; if he cannot make such a

showing, summary judgment is appropriate.  Celotex, 477 U.S. at 324.

**Request for Sage and Sweetgrass, and Cedar For Religious Ceremonies**

A.  Factual Background

Jacobs' assertion that Defendant will not allow him to practice his religion is based in part on

a refusal to allow him to purchase sage, sweetgrass, and cedar for use in religious ceremonies.

Jacobs alleges in his complaint that he first requested permission to order sage and sweetgrass

on April 4, 1999.  On April 7, 1999, Defendant sent a memo to Jacobs in response, notifying him that

the penitentiary would allow him to order sage and sweetgrass if he would supply a census number

to substantiate his claim to be Native American.  (Ex. D to Martinez Report, at unnumbered p. 1,

hereafter cited in the format, "Ex. D to MR at 1").  On April 13, 1999, Jacobs sent a return memo

to Defendant, stating that he should be allowed to practice his religion, Animism, whether or not he

is Native American, and that refusing to allow him to order sage and sweetgrass violated his First

Amendment religious rights.  (Ex. D to MR at 2).  Jacobs asserts that he received no response to this

memo.  (Complaint, at unnumbered p. 2).

Jacobs then filed a grievance with prison officials, stating that he wished to order sage,

sweetgrass, and cedar, and that Defendant was interfering with his religious freedom by requiring a

census number.  (Ex. D to MR, at 3-4).  His grievance was denied on June 2, 1999, on the following

grounds:  "Mr. Jacobs is on death row, and in accordance with policy CD-101100, is not eligible for

the items he is requesting.  In addition, per policy, he is not a verified Native American eligible to participate in those religious activities."  (Ex. D to MR, at 5).  Jacobs sent the same grievance in a week later, saying he had not had any acknowledgment that his grievance had been received.  (Ex. D to MR, at 11-12).  The response this time was the same.  (Ex. D to MR, at 13).

In addition, Defendant sent a memo to Lee Quintana, Grievance Officer, dated May 26, 1999, in which he stated that, pursuant to NMCD Policy CD-101101, only verified Native Americans may have the materials he is asking for and, furthermore, Jacobs' death sentence precluded him from receiving the items in any case.  Defendant further states:

> He claims that LCCF [Lea County Corrections Facility] staff can
> provide verification of his tribal affiliation.  As per Jerry Mondragon
> of Central Office (the designee for Native American issues),
> verification must come from the tribal government, otherwise it is not
> valid.  To date, no tribe is claiming Shawn Jacobs.   My dealings on
> this issue with inmate Jacobs consist of a verbal conversation during
> committee in which he acknowledged that he needed verification from
> the tribe with which he claimed
> affiliation  . . ..

(Ex. D to MR, at 14).

On August 20, 1999, Jacobs sent a letter to the Programs Director's Office, again requesting permission to order sage, sweetgrass, and cedar.  While acknowledging that he did not have a census number, Jacobs argued in this letter that he should be able to provide verification by other means, per Policy CD-101100.  He noted in the letter that he was attaching various documents which would prove that "my Grandfather was 3/4 Indian and my Grandmother was full-blooded Indian."  (Ex. D to MR, at 15).  Jacobs says he got no response to this letter.  (Complaint, at unnumbered p. 4).

On December 2, 1999, Jacobs sent a letter to various corrections officials, again requesting permission to order sage, sweetgrass, and cedar, which he said is used for purification in the Animism

4

Religion.  He added, "Having to supply you with a Census Number will only tell you that I am Indian not my religion . . . Religion is a system of beliefs not a race . . .  So not allowing me to order this stuff for my religion . . . is a direct violation of my Federal Laws and United States Constitution." (Ex. D to MR, at 16).  Not receiving a response to this letter, Jacobs filed another grievance, as well as a Notice of Claim with the Risk Management Division of the State of New Mexico, alleging violations of his constitutional rights.  (Ex. D to MR, at 17, 18).  On December 29, 1999, Jacobs' latest grievance was denied on the basis that his two previous grievances on the same issue had already been denied.  (Ex. D to MR, at 19).

      B.  <u>Discussion</u>

      Jacobs claims that Defendant's refusal to allow him to order these materials constitutes an unconstitutional interference with his right to practice his religion.  Although a prisoner retains a fundamental right to religious freedom during incarceration, the right to exercise his religion is not absolute.  <u>O'Lone v. Estate of Shabazz</u>, 482 U.S. 342, 107 S. Ct. 2400 (1987).  "The fact of confinement and the needs of the penal institution impose limitations on constitutional rights, including those derived from the First Amendment, which are implicit in incarceration."  <u>Jones v. North Carolina Prisoners' Labor Union, Inc.</u>, 433 U.S. 119, 125, 97 S. Ct. 2532, 2537-38 (1977). Many prison policies restricting inmates' First Amendment rights will be upheld even though the same policies would not be permissible outside prison walls.  <u>Giano v. Senkowski</u>, 54 F.3d 1050, 1053-54 (2d Cir. 1995).

      The First Amendment requires only that an inmate be accorded a reasonable opportunity to practice his religion, and "what constitutes a reasonable opportunity must be evaluated with reference to legitimate penological objectives of the prison."  <u>Mosier v. Maynard</u>, 937 F.2d 1521, 1525 (10th

Cir. 1991).  The issue whether an infringement of a prisoner's First Amendment right is "reasonably

related to legitimate penological objectives" is to be evaluated under the four-part test of  Turner v.

Safley, 482 U.S. 78, 87, 107 S. Ct. 2254, 2261 (1987).  Mosier; Hall, at 1113.  The four factors

include the following:

> First, there must be a 'valid, rational connection' between the prison
> regulation and the legitimate governmental interest put forward to
> justify it . . .  A second factor . . . is whether there are alternative
> means of exercising the right that remain open to prison inmates . . .
> A third consideration is the impact accommodation of the asserted
> constitutional right will have on guards and other inmates, and on the
> allocation of prison resources generally . . .  Finally, the absence of
> ready alternatives is evidence of the reasonableness of a prison
> regulation.

Turner, 482 U.S. at 89-90 (internal citations omitted).

Defendant contends that Jacobs' request for sage, sweetgrass, and cedar was turned down

for two reasons:  he could not document his Native American lineage, and his high security status

rendered him ineligible under prison policies.  Although Jacobs has claimed Native American heritage

and has submitted some documentary evidence in support of his claim, he also alleges in his complaint

that Defendant's actions violate equal protection, in that he should be allowed to practice the

Animism religion whether or not he can prove he is Native American.  This equal protection argument

need not be reached, however, because Defendant has shown a legitimate security justification for

refusing to allow Jacobs to order the materials he requests.

Under Turner, the Court must ask whether the prison regulations used to justify denial of an

inmate's request are reasonably related to the legitimate penological interest in maintaining prison

security, and whether an inmate whose request for religious materials is denied has other avenues of

practicing his religion in prison.  Hall, at 1113.  Defendant points to certain written NMCD policies,

6

as well as state statutes, as the basis for his assertion of security concerns regarding Jacobs' request

for religious material.  Policy CD-101300, attached the Martinez Report as Ex. A, provides that the

Department:

> shall provide religious programming for inmates <u>which is appropriate
> for the inmate's custody placement</u>, including program coordination
> and supervision, opportunities to practice one's faith, and the use of
> community resources, including volunteers, religious facilities and
> equipment.  The religious programs offered will reflect the diversity
> of traditions available in the larger, outside community, to the extent
> possible.  [Emphasis added].

This policy also requires that each institution establish and maintain a religious services program

consistent with state and federal requirements.  Policy CD-101301, also part of Ex. A to the Martinez

Report, provides that:

> [a]n inmate's religious requests, including those considered to be
> fundamental and essential, may be denied for reasons of security or for
> some other substantial reason.  If a request is denied, alternatives to
> accommodate the religious practice must be explored which might
> allow the inmate to practice by the means appropriate to their custody
> level.

Defendant also states in the Martinez Report that NMCD policy with regard to Native

American religious practices is governed as well by state statute, specifically the Native American

Counseling Act, NMSA (1978) §§ 33-10-1 to 33-10-4.  The Act provides that the NMCD shall

afford Native American religions the same standing and respect as Judeo-Christian religions and shall

permit regular access by Native American inmates to spiritual advisors, materials used in religious

ceremonies (including sage, sweetgrass, and cedar), and a sweat lodge on the grounds of the facility.

NMSA (1978) § 33-10-4(B).  The Act continues, "Any native American inmate may possess items

and materials used in religious ceremonies . . . as long as this possession does not threaten the

reasonable security of the corrections facility."  "Native American" is defined in the Act as "any person who is descended from or is a member of an American Indian tribe, pueblo or band or is a native Hawaiian or Alaskan native."  NMSA (1978) § 33-10-3(A).

NMCD Policies CD-101100 and 101101 (Ex. B to Martinez Report) are designed to implement the Native American Counseling Act.  These policies underwent a change during the course of this litigation, in conjunction with establishment after July 1, 2000 of a maximum security Special Control Unit ("SCU") at the Penitentiary of New Mexico.  (Supplementation to Martinez Report [Doc. 37], at 2-3, hereafter cited in the form, "SMR at 2-3").  Jacobs, who was  sentenced to death upon conviction of first degree murder, kidnaping with great bodily harm, attempt to commit sexual penetration, armed robbery, tampering with evidence, escape from a peace officer and other offenses, was placed in Administrative Segregation - Class B custody status, a category designed for inmates subject to heightened security concerns.[3]

The system of NMCD custody levels is in the process of being reorganized, in connection with establishment of the SCU.  Defendant reported that NMCD anticipates that Jacobs will be placed in Custody Levels V and VI at the Penitentiary.  "Custody Levels V and VI are the most controlled environments possible that provide the management necessary for the most dangerous, high-risk inmates . . .."  (Policy CD-143000, Ex. F to MR).

When Jacobs filed his complaint, CD-101100 provided that the policies relating to practice of Native American religious beliefs were not applicable to inmates on death row, or in Administrative

---

[3]His conviction was affirmed by the New Mexico Supreme Court on August 16, 2000, although the death sentence was vacated and the case sent back for a new sentencing proceeding. The Court has not been notified whether resentencing has occurred; however,   Defendant states in the Martinez Report that Jacobs remains in Administrative Segregation.

Segregation - Class B level, and Policy CD-101101 held that "Native American religious ceremonies shall be afforded at each correctional facility . . . consistent with reasonable security requirements." Current Policies CD-101100 and 101101 now apply to all Native American inmates.  However, those policies provide that Native American sweat lodge ceremonies shall be afforded at correctional facilities which are Security Level I, II, III or IV, consistent with reasonable security requirements, and that only Native American inmates classified as Custody Level I, II, III or IV and housed in institutions designated Security Levels I, II, III or IV will be allowed to participate in sweat lodge ceremonies, thus excluding inmates in Custody Levels higher than I through IV.

Tracking the statutory language of NMSA (1978) § 33-10-4, Policy CD-101101 also provides that the correctional facility shall permit regular access by Native American inmates to material used in religious ceremonies, such as cedar, sage, and sweetgrass.  However, inmates classified at Custody Level V and VI, or who are housed at a correctional institution designated as Security Level V or VI, will not normally be permitted to participate in a sweat lodge ceremony, "but may be provided access to a volunteer spiritual advisor on an individual basis with the spiritual advisor providing any materials needed if approved by the Warden."  (Ex. B.1 to SMR).

The Court finds that both the prior and current policies, which restrict certain religious activities by inmates in the highest security classifications, are reasonably related to legitimate penological interests and that, therefore, Defendant's refusal to allow Jacobs to obtain sage, sweetgrass, and cedar, did not violate his constitutional rights.

The plaintiff in Hall v. Bellmon, *supra*, alleged that prison officials interfered with his religious rights by, among other things, confiscating certain materials used in his Native American religion. The court applied the Turner factors to the situation and concluded that the district court correctly

found no unconstitutional interference with Hall's religious freedom. Although a portion of the materials involved in the <u>Hall</u> case included a sharp bear tooth necklace that an inmate could use to harm himself or others, and the materials involved in the present case do not present such an obvious potential for violence, the Court cannot say that there are no legitimate penological reasons for restricting possession of such materials to inmates in lower custody levels.

There is a rational connection between a prison regulation which excludes the highest-security inmates, particularly those in Administrative Segregation, from communal gatherings such as sweat lodge ceremonies. <u>McKinney v. Maynard</u>, 952 F.2d 350, 353 n.9 (10th Cir. 1991), *overruled on other grounds*, <u>McAlpine v. Thompson</u>, 187 F.3d 1213 (10th Cir, 1999); <u>Allen v. Toombs</u>, 827 F.2d 563, 567 (9th Cir. 1987). The prison reasonably provides an alternative means for Jacobs to practice his religion, in that an inmate in Custody Level V or VI may be provided access to a volunteer spiritual advisor on an individual basis "with the spiritual advisor providing any materials needed if approved by the Warden." The policy for new Custody Levels V and VI provides that inmates at these levels "may receive visits from chaplains, but may be required to remain in their cells during visits. These decisions will be made on an individual basis consistent with the security issues posed." (Policy CD-143005, § II(A)(2), Ex. F. to MR).

These alternative procedures satisfy <u>Turner</u>, and they satisfy the constitution. *See*, <u>Hall</u>, at 1113 ("The court also noted that the regulations guarantee inmates other avenues for the practice of their respective religions, including Native American beliefs"). The Court therefore rejects Jacobs' claims that Defendant interfered with his First Amendment rights by refusing to allow him to order sage, sweetgrass, and cedar.

**Haircut Issue**

A. <u>Factual Background</u>

Jacobs did not allege in his complaint any issue related to hair length.  However, on June 1, 2000, Jacobs filed a motion for inunction [Doc. 17], alleging that he was informed by corrections personnel that in July, he would be held down and forced to have his hair cut.  He stated in the motion that his hair length is central to his religious beliefs, and he asked the Court to issue an injunction to prevent the cutting of his hair while this action is pending.  On June 8, 2000, the Magistrate Judge conducted a telephonic status conference between Jacobs and counsel for Defendant, to examine the factual basis of Jacobs' claim.

Defendant's attorney confirmed that NMCD was proposing a revision to the inmate hygiene policy which, if ultimately approved, would require that all inmates wear their hair above the collar. She stated at that time that the policy might indeed go into effect on July 1, 2000, and that there was a possibility that Jacobs would be subject to the policy after that date.

On direction of the Court, Defendant submitted a letter to the Court, setting forth his position concerning any imminent danger to Jacobs' hair length.  The letter stated that revision of the hygiene policy was part of a comprehensive program intended to implement establishment of a SCU at the Penitentiary ( the "Special Control Unit" referred to above), which is intended to be a maximum security facility for inmates such as Jacobs with the highest custody classifications.  (*See* Policies CD-143000-143003, 143005, all included as Ex. F to MR).  The letter set forth the security reasons for requiring that hair be cut above the shirt collar and ears:

> There are several reasons for such a policy, including security concerns.  Short hair makes it more difficult for inmates to conceal weapons, drugs and other contraband. Long hair requires correctional

officers to touch inmates' hair in order to conduct proper searches. Short hair makes it more difficult for inmates to alter their appearance, for example, in case of an escape. Short hair is more difficult to grab in a fight. There are also safety reasons for such a policy. Long hair is more likely to get caught in machinery, doors, etc. Additionally, there are health and hygiene justifications. Long hair is more difficult to keep clean and more likely to fall into food during preparation and service. The final reason involves uniformity, which promotes a sense of order and respect, while discouraging signs of gang affiliation.

(Letter dated June 16, 2000 to Hon. Lorenzo F. Garcia from Ida M. Lujan, Deputy General Counsel, NMCD, at 1-2). The letter further stated that the NMCD would likely include a provision in the new policy allowing exemptions for sincerely held religious beliefs and practices, and it contained the assurance that while the policy is being revised, no one would force Jacobs to have a haircut. Based on these assurances, the Court denied the request for injunctive relief. [Doc. 21]. On two occasions since that denial, Jacobs filed renewed requests for injunctive relief, alleging imminent danger of a haircut. [Docs. 23, 35]. The first such request was denied on grounds that Jacobs' formal request for an exemption was still pending; however, in connection with Jacobs' second renewed request, the Court ordered Defendant to file a supplement to the Martinez Report, stating whether Jacobs was in imminent danger of having his hair cut in February 2001, as he alleged.

In the supplemental Martinez Report, Defendant stated that the new grooming policy requires that inmates wear short hair but provides an exemption for sincere religious beliefs. The grooming policy now in effect is contained in CD-151100 and CD-151101 (Ex. E to MR). The supplemental report also states that the revised policy implementing the Native American Counseling Act, CD-101101, provides that "No Native American shall be required to cut his/her hair . . . if [it] conflicts with his/her sincerely held traditional Native American religious beliefs, unless the Warden is able to articulate and document an important safety or security reason." (Ex. B.1 to SMR).

Defendant further asserts that the process of redesigning and designating an SCU at the Penitentiary's North Facility, where Jacobs is housed, is still ongoing but that once that process is complete, orientation and training will be conducted for inmates which will include instructions on the procedure for requesting an exemption to the hair cutting requirement.  Defendant states that Level VI inmates, such as Jacobs, will receive this orientation in March 2001, and that he is not yet subject to the grooming requirements because the new custody levels have not yet been implemented at the North Facility.  (*See*, SMR, at 3-5; Ex. H to SMR).

Defendant also stated in the supplemental Martinez Report that Jacobs had not submitted any request for an exemption to the hair cutting requirement, as he represented in his July 11, 2000 letter to the Court (docketed as a renewed motion for injunctive relief, Doc. 23).  Jacobs disputed this assertion in his response [Doc. 38] to the supplemental report, contending that  he did indeed submit a written exemption request  and mailed it to the Warden with a cover letter, asking that request be given to the Review Committee.

In its order denying Jacobs' third request for an injunction, the Court held that it need not decide this factual dispute because, in light of Defendant's assurances that Jacobs would not be subject to a haircut until he is able to apply for an exemption in accordance with the new procedures, there was no basis for injunctive relief.  The Court directed Jacobs to utilize the new procedures if he wished to apply for an exemption.  [Doc. 40].

B.  Discussion

In his supplemental Martinez Report, Defendant states that Jacobs is potentially subject to the grooming and hygiene requirements, including the short-hair policy, unless he obtains an exemption based on sincerely held religious beliefs in accordance with NMCD policies and procedures.

Defendant states further that "any decision to grant or deny [Jacobs'] exemption request will be made in accordance with the procedure therefor set out in the Inmate Grooming and Hygiene Policy or based on the Warden's articulable and documented safety/security concerns in accordance with . . . the amended policy based on the Native American Counseling Act for Inmates."  (SMR, at 7).

A prison inmate professing beliefs rooted in Native American religious tradition has a constitutional right to keep his hair long, so long as the practice does not interfere with legitimate penological objectives.  Mosier, at 1525, 1526 n.3.  A prison policy which generally requires short hair on all inmates can legitimately be justified on grounds that it prevents inmates from hiding weapons in long hair and from easily changing their appearance, and for reasons of hygiene and uniformity.  Hall, at 1114; Longstreth v. Maynard, 961 F.2d 895, 901 (10th Cir. 1992).  These are some of the reasons advanced by Defendant for the short-hair policy for Level V and VI inmates, embodied in CD-151100 (Ex. E to MR), discussed below.  Similar reasons have been found to satisfy the four-part Turner test.  Pollock v. Marshall, 845 F.2d 656 (6th Cir. 1988).

In addition, Defendant offers Jacobs and other high security inmates an opportunity to apply for a religious exemption to the short-hair policy, and these application procedures comport with constitutional requirements.  Prison officials do not violate the constitution by requiring that an inmate prove that his belief is religious in nature, and that it is sincerely held.

> 'A way of life, however virtuous and admirable, may not be interposed as a barrier to reasonable state regulation . . . if it is based upon purely secular considerations; to have the protection of the Religion Clauses, the claims must be rooted in religious beliefs . . .  States are clearly entitled to assure themselves that there is an ample predicate for invoking the Free Exercise Clause . . .  Without question, the prison may determine whether plaintiff's beliefs are sincere, meaning whether they are 'truly held and religious in nature' . . .  A religious belief

14

which is not sincerely held or a belief which purely secular does not
require the prison to consider accommodation."

Mosier, at 1526.

The new grooming policy is contained in Policies CD-151100 and CD-151101 (Ex. E to
Martinez Report).  Pursuant to these policies, inmates designated as Level V or VI will be required
to keep their hair above the ears and shirt collar level.  The purpose of the policy is as follows:

> The Corrections Department finds that for reasons of security, safety,
> health and uniformity, inmates in Levels V and VI shall be required to
> maintain grooming standards as set out in procedures CD-151101.
> More specifically, short hair makes it more difficult for inmates to
> conceal weapons, drugs and other contraband.  Long hair requires
> correctional officers to touch inmates' hair in order to conduct proper
> searches.  Short hair makes it more difficult for inmates to alter their
> appearance in the event of an escape or in an effort to conceal their
> identity within the institution.  Short hair is more difficult for other
> inmates to grab during a fight.
>
> Short hair is safer than long hair because it is less likely to become
> caught in machinery or a door or to catch fire.  Short hair is more
> hygienic than long hair because it is easier to keep clean and free from
> lice.
>
> Finally, the Corrections Department finds that there is a greater need
> for uniformity in Levels V and VI to promote order, discipline and
> respect while discouraging signs of gang affiliation and thereby
> discouraging gang activity.

(Policy CD-151100, § III, Ex. E to MR).

The procedure for exemptions to the short-hair policy are governed by CD-151101 (Ex. E
to MR), which provides that inmates having sincerely-held religious beliefs regarding hair length may
apply for an exception to the grooming standards.  The policy further provides that the belief must
be sincerely held and must be religious in nature, rather than secular.  An inmate wishing to be
exempted must submit a written request to the Review Committee at his institution, including an

15

essay stating in detail the reasons why the exemption should be granted, specifying the religion of which he is a believer, and detailing why compliance with the grooming standards would violate his religious faith.

The policy sets forth a detailed list of the factors to be considered by the Review Committee in considering an inmate's exemption request.  In determining whether a religious belief is grounded in a bona fide religion, the issue is not whether the religion is "mainstream" or alternative; rather, the Committee is to consider factors such as the existence of a substantial body of literature supporting the religion, the existence of a formally organized worship of shared belief by a recognizable and cohesive group, the association of persons who share common ethical and moral views as opposed to simply a personal moral code, the historical record of the asserted religion, and other factors.

In determining whether the religious belief is "sincerely held," the Committee is to consider such factors as whether the inmate is a descendant or member of the particular ethnic group with which the religion is associated, although "failure to demonstrate membership in a formal group (e.g., failure of a Native American to demonstrate a BIA number) shall not necessarily result in a denial of a request for an exception"; whether the inmate is a member of any religious organization of followers of the specific religion; how long the inmate has practiced these religious beliefs; and other factors. In addition, the policy provides that the Committee is to consider whether there are compelling penological reasons to deny the request; several are listed, but the list is not exclusive.  The policy goes on to state that the Review Committee may deny the request, grant it outright, or grant it upon reasonable conditions, and shall inform the inmate in writing of its decision, including a brief explanation of the decision.

Attached to the supplemental Martinez Report is the affidavit of Fr. Ricardo Russo, the

institutional chaplain at the Penitentiary.  (Ex. H to SMR).  He explains that, as the new custody levels are implemented at the Penitentiary, and as part of the orientation process, he will provide caseworkers with information packets explaining to inmates how they can apply for exemptions to the grooming policy.  The packet contains 12 questions designed to elicit information relevant to the factors which the Review Committee must consider in determining an inmate's eligibility for an exemption.

The Court finds that these policies and procedures satisfy any constitutional concerns about Jacobs' religious beliefs regarding hair length.  The procedures are thorough, reasonable, and comport with all legal standards for due process, equal protection, and protection of inmates' First Amendment rights with regard to hair length and religious conviction, and the Court sees no reason to delay a ruling on this claim.  If after utilizing these procedures, Jacobs feels that they have been unconstitutionally applied, he may file a new lawsuit; however, at present, he has not demonstrated any threatened action by Defendant which would justify injunctive relief, nor has he shown any injury justifying damages.

## Conclusion

Summary judgment should be granted to Defendant, because there is no genuine issue of any material fact which requires that the case proceed to trial.  The order directing submission of a Martinez Report [Doc. 19] gave the parties notice that the report might be used in deciding whether to grant summary judgment of Jacobs' claims.  *See*, Durtsche v. American Colloid Co., 958 F. 2d 1007, 1009 n.1 (10th Cir. 1992), quoting Celotex, 477 U.S. at 326 ("district courts are widely acknowledged to possess the power to enter summary judgments *sua sponte*").

The Court finds that Defendant had legitimate penological interests, based on Jacobs' high

17

security classification, for refusing to allow him to order religious materials including sage, sweetgrass, and cedar, and that prison policy provides Jacobs with alternative means of practicing his religion through the use of an individual spiritual advisor who can provide these herbs and plant materials.  In addition, Defendant's short-hair policy for high-security inmates is based on legitimate penological objectives, and Jacobs will be afforded a procedure for applying for an exemption which passes constitutional muster.  His assertion of violations of First Amendment rights are therefore rejected.

Furthermore, as noted above, the Court does not reach his equal protection claim, having found that Defendant asserted sufficient ground for its treatment of Jacobs, quite apart from the proof of heritage issue and, in addition, the grooming exemption procedures state explicitly that failure to demonstrate tribal affiliation will not necessarily result in denial of an exemption.  (Policy CD-151101, § II(I)(3)(c)(1), Ex. E to MR).

Finally, the Court rejects Jacobs' Eighth Amendment argument:

> The Eighth Amendment's proscription of cruel and unusual punishment applies to unnecessary and wanton infliction of pain which is grossly disproportionate to the severity of the crime committed. Rhodes v. Chapman, 452 U.S. 337, 346.  Enforcement of the grooming code [and refusal to allow purchase of sage, sweetgrass, and cedar] clearly survives this exacting inquiry.

Larkin v. Reynolds, 39 F.3d 1192 (Table, text in Westlaw), No. 94-7013, 1994 WL 624355, at *2 (10th Cir. Nov. 8, 1994).

18

**<u>Recommended Disposition</u>**

That summary judgment be entered in favor of Defendant.


_Lorenzo F. Garcia_
Lorenzo F. Garcia
United States Magistrate Judge